## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Hilliary Acquisition Corp. 2016, LLC | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 24-1371 |
| | ) | |
| Federal Communications Commission, | ) | |
| Respondent. | ) | |

## OPPOSITION OF THE FEDERAL COMMUNICATIONS COMMISSION TO PETITION FOR WRIT OF MANDAMUS

On December 5, 2024, Hilliary Acquisition Corp. 2016, LLC (Hilliary) filed a petition for a writ of mandamus to "compel the FCC to issue a refund" of certain spectrum auction bid payments to Hilliary. Pet. 12. By order dated December 19, 2024, the Court directed the Federal Communications Commission to file a response.

Hilliary placed winning bids for 42 licenses in an FCC spectrum auction held in 2020 (Auction 105). But after the auction closed, Hilliary missed the deadline for making a down payment on its winning bids. Hilliary thus defaulted on its bids and incurred a default payment obligation. Hilliary nonetheless paid the full amount of its winning bids (less a bidding credit) plus a late fee a few weeks later.

The amount of a default payment depends in part on the winning bid in a subsequent auction of licenses to use the spectrum covered by a defaulted-on winning bid, which can occur years after the default. To help ensure that default payments are paid, the Commission holds payments deposited by winning bidders who defaulted pending calculation of their final default payments. In this case, after Hilliary defaulted, the Commission assessed Hilliary an interim default payment equal to 20 percent of its net winning bids and retained the remainder of Hilliary's payments on deposit pending calculation of its final default payment.

On March 28, 2023, Hilliary asked the Commission to refund all of the payments Hilliary had made in Auction 105. Hilliary asserted that because the Commission's general authority to auction spectrum licenses had recently lapsed, the agency cannot auction licenses to use the same spectrum in the future, and thus cannot determine the amount of its final default payment.

On January 16, 2025, the Commission's Wireless Telecommunications Bureau, Mobility Division, and Office of Economics and Analytics, Auctions Division (hereafter, "Commission staff") jointly

issued a Letter Order that denied Hilliary's request for a refund and explained the reasons for that decision. As a result, "mandamus is unavailable" to Hilliary "because an adequate alternative remedy exists." *In re Flynn*, 973 F.3d 74, 79 (D.C. Cir. 2020) (en banc). Hilliary is now free to seek review of the denial from the full Commission, and if its request for refund is again denied, Hilliary can petition for judicial review of the Commission's decision. Hilliary's request for a writ of mandamus should be denied.

## BACKGROUND

### A. Statutory And Regulatory Background

The Communications Act of 1934 authorizes the Commission to award licenses to use electromagnetic spectrum to provide communications services. *See* 47 U.S.C. §§ 307, 309. Since 1993, the Act has required the Commission to award most spectrum licenses "through a system of competitive bidding," *i.e.*, by auction. 47 U.S.C. § 309(j)(1). Congress directed the Commission to a design a competitive bidding system that "recover[s] for the public…a portion of the value of the public spectrum resource made available for commercial use," *id.*, § 309(j)(3)(C), and to "prescribe regulations" that "include performance

requirements, such as appropriate deadlines and penalties for performance failures…to promote investment in and rapid deployment of new technologies and services," *id.*, § 309(j)(4)(B).

Following that directive, the Commission enacted rules providing that a party who chooses to place a bid in an auction "assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction." 47 C.F.R § 1.2104(g)(2). If a bidder places a winning bid, but defaults or is disqualified after the close of the auction, it "will be subject to a default payment." *Id.* A winning bidder that misses the deadline to remit a down payment on its winning bids is deemed to have defaulted. *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd 2348, 2382-83, ¶197 (1994) (*Competitive Bidding Second Report and Order*); 47 C.F.R. § 1.2109(b).

A default payment has two parts: (1) a "deficiency payment" that is equal to the difference between the amount of the defaulter's original winning bid and the subsequent winning bid for the same spectrum, 47 C.F.R. § 1.2104(g)(2)(i), and (2) an "additional payment" that is equal to a percentage of the original winning bid, or the subsequent winning bid,

whichever is less, *id.*, § 1.2104(g)(2)(ii). Pending calculation of the default payment, the Commission "hold[s] deposits made by defaulting or disqualified auction winners to help ensure that the penalty is paid." *Competitive Bidding Second Report and Order*, 9 FCC Rcd at 2383, ¶197.

## B. Auction 105

In Auction 105, held in 2020, Hilliary was the winning bidder for 42 Priority Access Licenses (PALs) in the 3550-3650 MHz spectrum band, with net winning bids totaling $805,965,000. *Hilliary Acquisition Corp 2016, LLC Request for Waiver of Down Payment Deadline for Auction 105*, 37 FCC Rcd 8228 (OEA & WTB 2022) (*Waiver Denial Order*), Pet. Add. 5.

Hilliary was required to make a down payment of 20 percent of its net winning bids ($161,193) within 10 business days after the Commission issued a public notice closing the auction (September 17, 2020). *Id*. After applying Hilliary's pre-auction upfront payment ($102,700) toward its post-auction down payment, Hilliary was required to remit an additional $58,493 by that deadline. *Id*. Hilliary did not make that payment by September 17, 2020, however; it thus defaulted

on its winning bids. *Id.*; 47 C.F.R. § 1.2109(b). Despite defaulting, Hilliary submitted an additional payment of $738,428.25 on October 8, 2020, which was equivalent to Hilliary's remaining balance (*i.e.*, the amount of its net winning bids less its upfront payment), plus a five percent late fee. Pet. Add. 6.[1] In total, Hilliary deposited $841,128.25 with the Commission. Pet. 3.

On November 4, 2020, Hilliary requested a waiver of the down payment deadline and acceptance of its late payment to cover its winning bids. Pet. Add. 6. On July 18, 2022, Commission staff denied Hilliary's waiver request and affirmed that Hilliary had defaulted on its winning bids. *Id.* at 4. As a result, Hilliary incurred a default payment equal to at least 20 percent of its net winning bids, but potentially more, depending on the winning bids in a future auction of licenses to use the same spectrum. *Id.* at 10. Commission staff accordingly assessed an interim default payment of $161,193, *see* 47 C.F.R. § 1.2104(g)(2), and "appl[ied] Hilliary's payment on deposit to satisfy" that "obligation." *Id.*

---

[1] Though the Commission's rules do not provide for late down payments, they do permit a winning bidder to pay the final balance of its winning bid within 10 days after the final payment deadline if it also pays a late fee equal to five percent of the amount due. 47 C.F.R. § 1.2109(a).

10. Commission staff also clarified that "[c]onsistent with Commission precedent," Hilliary's remaining balance would be addressed "after licenses covering the same spectrum are re-auctioned and the final default payment can be calculated." *Id.* (citing *AirCom Commc'n Consultants, Inc.*, 16 FCC Rcd 17685, 17691, n.47 (WTB 2001)).

## C. The Commission's Auction Authority

The Commission's general authority to auction spectrum licenses lapsed on March 9, 2023, when Congress failed to pass legislation extending the agency's authority beyond that date. *See* 47 U.S.C. § 309(11).

## D. Hilliary's Request For A Refund

On March 28, 2023, approximately two and a half years after making its final payment in Auction 105, Hilliary requested "expedited refund of [its] remaining monies on deposit" with the Commission. Pet. Add. 1. Hillary asserted that a reauction of the spectrum covered by its winning bids was "currently impossible," given the lapse in the Commission's general auction authority. *Id.* Hilliary further asserted that a refund would allow it to reinvest the funds in rural communities,

whereas the Commission's retention of those funds "prevents their use for any purpose." *Id.* at 3.

**E. Denial Of Hilliary's Refund Request**

On January 16, 2025, Commission staff, acting on authority delegated by the Commission, 47 C.F.R. §§ 0.271, 0.331, denied Hilliary's refund request. Letter from Mary Lovejoy and Roger Noel, Federal Communications Commission, to Caressa D. Bennet, Counsel for Hilliary Acquisition Corp. 2016, LLC (January 16, 2025) (*Refund Denial Letter*). Resp. Add. 1-8.

1. The *Refund Denial Letter* rejected Hilliary's argument that the Commission must refund Hilliary's monies, because without auction authority, the agency cannot conduct a future auction of licenses to use the same spectrum and thus cannot determine the amount of Hilliary's final default payment. *Id.* at 4-6.

To start, the *Refund Denial Letter* observed that Hilliary had not identified any Commission rule or precedent that entitled Hilliary to a refund of its payments on deposit. *Id.* at 4. The letter pointed out that Hilliary had assumed a "binding obligation" to pay the full amount of its winning bids, and the Commission's default payment method, 47 C.F.R.

§ 1.2104(g)(2), can only reduce (but not eliminate) that obligation depending on the winning bids for relevant licenses in a future auction. *Id.* It further noted that the Commission has a decades-long practice of holding any payments deposited by defaulting winning bidders to help ensure that final default payments, once calculated, are paid. *Id.*[2] The *Refund Denial Letter* therefore concluded that even if the agency, for the time being, cannot auction new spectrum licenses, Hilliary is still liable for the default payment it incurred in Auction 105, and its deposited payments should be retained by the Commission pending calculation of that amount. *Id.*

Next, the *Refund Denial Letter* explained that Hilliary overstated the effect of the lapse in the Commission's auction authority, pointing out that a subsequent auction only determines whether Hilliary will incur a deficiency payment, *see* 47 C.F.R. § 1.2104(g)(2)(i), on top of the "additional payment" obligation, *see* 47 C.F.R. § 1.2104(g)(2)(ii), that it

---

[2] *See, e.g., Application of the ERIE Radio Company, LLC*, 32 FCC Rcd 3890, 3897, ¶20 n.56 (MB & WTB 2017) (holding the final payment of a winning bidder who defaulted on the down payment for a construction permit for an FM radio station license pending a subsequent auction of the permit and calculation of the winning bidder's final default payment).

incurred upon default (*i.e.*, at least 20 percent of its net winning bids, or $161,193). *Id.* The *Refund Denial Letter* thus declined to refund the money that Hilliary undisputably will owe under the Commission's default payment rule, pointing out that Hilliary had failed to explain "why the Commission must refund the interim default payment" now, "only to have to collect it from Hilliary later." *Id.* at 4-5.

The *Refund Denial Letter* also disagreed with Hilliary that a future auction is unlikely, noting that Congress has repeatedly extended the Commission's auction authority, and had recently directed the Commission to auction spectrum unlicensed after Auction 97 due to defaults by winning bidders. *Id.* at 5.[3] It further observed that less than five years had elapsed since Auction 105 closed, and on a number of occasions, a subsequent auction of the same spectrum had taken longer—in one case, 15 years. *Id.*

2.  The *Refund Denial Letter* also found that granting Hilliary's refund request would not serve the public interest. *Id.* at 6. It explained

---

[3] Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, H.R.5009, 118th Cong., Div. E, Title LIV, § 5401-5405 (Spectrum and Secure Technology and Innovation Act), § 5403 (2024), https://www.congress.gov/bill/118th-congress/house-bill/5009.

that default payments "protect[] the integrity of the auction process," because they deter defaults and help the Commission recover "the full value of" defaulted-on winning bids. *Id.* at 6-7. If the Commission "cannot recover default payments," the letter explained, "then default payments will have no deterrent effect." *Id.* at 7.

The *Refund Denial Letter* also found "unpersuasive" Hilliary's contention that it would "invest" the refund "in broadband access," noting that "there is no guarantee" that Hilliary will do so or that the investment "ultimately would further the public interest." *Id.* "Given the amount of the defaulted bids at issue and the absence of other funds to satisfy Hilliary's ultimate final default obligation," the letter concluded that "prudence counsels that the Commission retain the amounts on deposit." *Id.*[4]

## ARGUMENT

Hilliary asserts that it "has no adequate alternative remedy other than to seek a writ of mandamus" because "[u]nless and until the

---

[4] The *Refund Denial Letter* noted that it in a prior case, where the Commission denied a defaulter's request for a refund of its payments on deposit pending reauction, the defaulter's deposited funds did not cover its final default payment. *Refund Denial Letter* 7, n.49 (citing and discussing *TPS Utilicom, Inc.*, 18 FCC Rcd 21332, 21336 (WTB 2003).

Commission acts on [its refund] request, it cannot appeal any adverse decision, and the FCC is not required to act on this request." Pet. 11. Now that Hilliary has received the remedy that it asked for—a decision on its refund request—Hilliary can file an application for full Commission review of the *Refund Denial Letter*, 47 C.F.R. § 1.115, and if the Commission affirms the denial, Hilliary can petition for judicial review of that decision, 47 U.S.C. § 402(b), 28 U.S.C. § 2342(1). Mandamus "will not issue where there exist other administrative or legal remedies." *Career Educ., Inc. v. Dept. of Educ.*, 6 F.3d 817, 819 (D.C. Cir. 1993). Thus, mandamus is not available to Hilliary.

## CONCLUSION

The petition for a writ of mandamus should be denied.

Respectfully submitted,

Jacob M. Lewis
Deputy General Counsel

*/s/ Maureen K. Flood*

Maureen K. Flood
Counsel
Federal Communications Commission
Washington, D.C. 20554
(202) 418-1753

January 21, 2025

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒  this document contains <u>2,272</u> words, *or*

    ☐  this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Office 365</u> in <u>Century Schoolbook</u>, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using _____ with _____.


*/s/ Maureen K. Flood*

Maureen K. Flood
Counsel

Federal Communications
Commission
Washington, D.C.  20554
(202) 418-1740

# Addendum

**Table of Contents**

Letter from Mary Lovejoy and Roger Noel, Federal Communications Commission, to Caressa D. Bennet, Counsel for Hilliary Acquisition Corp. 2016, LLC (January 16, 2025) …………………………….. ADD. 1-8.



# Federal Communications Commission
## Washington, D.C. 20554

January 16, 2025

DA 25-61

**<u>Via Certified Mail, Return Receipt Requested</u>**

Caressa D. Bennet, Esq.
Womble Bond Dickinson, LLP
2001 K Street, NW
Suite 400 South
Washington, DC 20006

**Re:     Hilliary Acquisition Corp 2016, LLC Request for Expedited Auction Refund**

Dear Ms. Bennet:

This letter responds to your request on behalf of Hilliary Acquisition Corp 2016, LLC (Hilliary) that the Federal Communications Commission (Commission) refund amounts that Hilliary has on deposit with the Commission in connection with Auction 105.[1]  Hilliary deposited a total of $841,128.25 with the Commission, but defaulted on 42 winning bids.[2]  The Auctions Division of the Office of Economics and Analytics (OEA) and the Mobility Division of the Wireless Telecommunications Bureau (WTB) assessed Hilliary an interim default payment of $161,193.00 and will assess a final default payment after license(s) for the covered spectrum receive winning bids in a future auction.[3]  To ensure payment of Hilliary's final default payment, we deny Hilliary's request for a refund of its "remaining monies on deposit."[4]

## BACKGROUND

On September 2, 2020, WTB and OEA announced the close of Auction 105 and identified the winning bidders in the *Auction 105 Closing Public Notice*.[5]  At the close of Auction 105, Hilliary was the winning bidder for 42 Priority Access Licenses (PALs) in the 3550-3650 MHz band across 21 counties, with gross winning bids totaling $948,195.00.  After applying its claimed 15% bidding credit as a rural

---

[1] Letter to Jonathan M. Campbell, Chief, Auctions Division, Office of Economics and Analytics, from Caressa D. Bennet, Counsel to Hilliary Acquisition Corp 2016, LLC (Mar. 28, 2023) (Hilliary Refund Request).

[2] *Hilliary Acquisition Corp 2016, LLC, Request for Waiver of Down Payment Deadline for Auction 105*, Memorandum Opinion and Order, 37 FCC Rcd 8228, 8229, para. 5 (OEA/WTB 2022) (*Order*); *see* 47 CFR § 1.2109(b) ("If a winning bidder … fails to remit the required down payment within ten (10) business days after the Commission has declared competitive bidding closed, the bidder will be deemed to have defaulted, its application will be dismissed, and it will be liable for the default payment specified in §§ 1.2104(g)(2) or 1.2104(g)(3), whichever is applicable.").

[3] *Order*, 37 FCC Rcd at 8234, para. 19.

[4] Hilliary Refund Request at 1.

[5] *See Auction of Priority Access Licenses in the 3550-3650 MHz Band Closes; Winning Bidders Announced for Auction 105*, AU Docket No. 19-244, Public Notice, 35 FCC Rcd 9287 (OEA/WTB 2020) (*Auction 105 Closing Public Notice*).

Add.1

service provider,[6] Hilliary's net winning bids amounted to $805,965.00.[7]  Pursuant to the Commission's competitive bidding rules, Hilliary was required to submit a down payment of 20% of its net winning bids, equal to $161,193.00, within ten business days after the release of the *Auction 105 Closing Public Notice*.[8]  After applying its upfront payment of $102,700.00 toward its down payment obligation,[9] Hilliary was required to submit an additional $58,493.00 to the Commission by September 17, 2020.[10] Notwithstanding its obligation, Hilliary failed to make any payment by the down payment deadline, thereby defaulting on all of its 42 winning bids.[11]

In addition to making down payments by September 17, 2020, winning bidders in Auction 105 were required to make final payments of their remaining balances by October 1, 2020.[12]  Unlike the down payment deadline, which does not have a late payment option, final payments could be made after October 1, 2020, provided the payment included a 5% late fee and was made by October 16, 2020.[13] Despite defaulting on all of its 42 winning bids when it failed to make any payment by the down payment deadline, Hilliary submitted an additional payment in the amount of $738,428.25 on October 8, 2020.[14] Nearly a month later (and seven weeks after the down payment deadline), on November 4, 2020, Hilliary submitted an amendment to its long-form application seeking waiver of the down payment deadline and acceptance of its October 8, 2020 payment in fulfillment of its winning bids.[15]  Hilliary explained in its waiver request that the October 8, 2020 payment was intended to cover the down payment and final payment, along with an additional 5% late fee.[16]

---

[6] *Auction of Priority Access Licenses for the 3550-3650 MHz Band, 271 Applicants Qualified to Bid in Auction 105*, AU Docket No. 19-244, Public Notice, 35 FCC Rcd 6672, 6685 (Attachment A) (2020) (*Auction 105 Qualified Bidders Public Notice*).

[7] *Auction 105 Closing Public Notice*, 35 FCC Rcd at 9306 (Attachment A).

[8] *See Auction of Priority Access Licenses for the 3550-3650 MHz Band, Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments and Other Procedures for Auction 105*, AU Docket No. 19-244, Public Notice, 35 FCC Rcd 2140 (OEA/WTB 2020) (*Auction 105 Procedures Public Notice*).

[9] *Auction 105 Qualified Bidders Public Notice*, 35 FCC Rcd at 6691.

[10] *Order*, 37 FCC Rcd at 8229, paras. 3-5.  Attachment B of the *Auction 105 Closing Public Notice* advised winning bidders of the exact amounts for deposits due after the application of the bidder's upfront payment.  *Auction 105 Closing Public Notice*, 35 FCC Rcd at 9318-43.  The *Auction 105 Closing Public Notice* shows that Hilliary had an upfront payment amount of $102,700.00 on deposit and therefore was required to submit an additional $58,493.00 by September 17, 2020, to satisfy its $161,193.00 down payment obligation.  Attachment B also shows that Hilliary's final additional payment amount would have been $644,772.00.

[11] *Order*, 37 FCC Rcd at 8229, para. 5; *see also* 47 CFR § 1.2109(b).

[12] *Auction 105 Closing Public Notice*, 35 FCC Rcd at.9290, para. 13.

[13] *Id.* at 9290, para. 14.  Pursuant to section 1.2109(a) of the rules, a winning bidder that timely makes its down payment is required to pay a final payment consisting of its remaining balance due. 47 CFR § 1.2109(a).  Section 1.2109(a) provides that any such winner also has an option to pay the final balance ten business days after the final payment deadline, provided that it also pays a late fee equal to five percent of the amount due.  *Id.*

[14] *Order*, 37 FCC Rcd at 8230, para. 7.

[15] *Id.*

[16] *Id.* at 8230, para. 8.

OEA's Auctions Division and WTB's Mobility Division denied Hilliary's request for waiver of the down payment deadline on July 18, 2022.[17]  As explained in the *Order*, Hilliary's default subjected it to the Commission's default payment rules.[18]  Those rules require Hilliary to make a payment equal to the difference between the amount of its bids and the amount of subsequent winning bids for license(s) covering the same spectrum as the licenses covered by the winning bids on which Hilliary defaulted.[19]  Hilliary also is liable for an additional payment equal to 20% of its defaulted bids, or the subsequent winning bids, whichever is less.[20]  Consequently, Hilliary's final obligation to the Commission will be at least 20% of its defaulted net bids, but it may owe more depending on the outcome of a future auction.[21]  As stated in the *Order*, because the Commission could not fully determine the amount of Hilliary's default payment prior to a subsequent auction, the Commission assessed an interim default payment of $161,193.00, or 20% of the total amount of Hilliary's net defaulted bids, which will be applied toward Hilliary's final default payment.[22]

The *Order* further explained that, pursuant to section 1.2109(e) of the Commission's rules, we would apply Hilliary's payment on deposit to satisfy this interim default payment obligation.[23]  Regarding the remaining monies on deposit, the *Order* explained that "consistent with Commission precedent, the disposition of the remaining amount of monies on deposit with the Commission . . . will be addressed . . . after licenses covering the same spectrum are re-auctioned and the final default payment can be calculated."[24]

On March 28, 2023, less than three weeks following the lapse of the Commission's general auction authority, Hilliary submitted the instant request that the Commission expedite a refund of its "remaining monies on deposit related to its participation in Auction 105," asserting that the Commission "must resolve the matter of [its] final default payment and refund immediately" because the Commission's current lack of general auction authority makes a subsequent auction "impossible." Hilliary further contends that a subsequent auction of the covered spectrum is "unnecessary."[25]  Hilliary

---

[17] *Id*. at 8233, 8234, paras. 17, 20.

[18] *Id*. at 8230-34, paras. 9-19.

[19] 47 CFR § 1.2109(g)(2) (incorporating § 1.2104(g)(1)).

[20] *Id.*

[21] At an absolute minimum, Hilliary will owe 20% of its aggregate net defaulted bids as a default payment.  If a subsequent winning bid is greater than the defaulted bid, the default payment will be 20% of the defaulted bid.  If a subsequent winning bid is less than the defaulted bid, the total default payment will always be greater than 20% of the defaulted bid.  In that case, the total default payment is the defaulted bid minus the lesser subsequent winning bid plus 20% of the lesser subsequent winning bid.

[22] *Order*, 37 FCC Rcd at 8234, para. 19.

[23] *Id.*

[24] *Id.* at 8234 n.52*; see AirCom Communication Consultants, Inc.*, Order, 16 FCC Rcd 17685, 17691 n.47 (WTB 2001), *recon. denied sub nom.*, *AirCom Consultants, Inc.*, Order on Reconsideration, 18 FCC Rcd 1806 (WTB 2003); *see also* 47 CFR § 1.2104(g)(2).

[25] Hilliary Refund Request at 1-2.  Hilliary's request for its "remaining monies on deposit" does not expressly address whether it seeks the return of all its funds, including the interim default payment amount of $161,193 (i.e., the least amount that Hilliary could owe in the absence of a deficiency between its defaulted bids and the subsequent winning bids).  In any case, Hilliary fails to explain how the lapse of auction authority on March 9, 2023, provides a basis for nullifying the obligation it incurred from its default on September 17, 2020 and the $161,193 interim default payment assessed on July 18, 2022.

also asserts that refund of its deposited funds will allow it to reinvest the funds in rural communities, while the Commission's retention of these funds prevents their use for any purpose.[26]

## DISCUSSION

Hilliary's assessment of a future auction is incorrect: A subsequent auction with respect to the spectrum is possible if authorized by Congressional action, and the Commission could find a subsequent auction would be necessary to further the public interest. Moreover, Hilliary's binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction is not dependent on the timing of when Hilliary's final default payment amount can be determined.[27] Finally, consistent application of the Commission's default payment rules benefits the public interest by protecting the integrity of future Commission auctions and, contrary to Hilliary's claim, returning funds to Hilliary will not necessarily lead to a public benefit.

Hilliary has not identified any Commission rule or precedent that entitles it to a refund of its payments on deposit with the Commission prior to calculation of its final default penalty. When Hilliary placed bids in Auction 105, it assumed a "binding obligation" to pay its full winning bid amounts.[28] The Commission's default payment method provides that a defaulting bidder's payment obligation may be reduced depending on the amount of any subsequent winning bids.[29] "[T]o help ensure" that the total amount of owed for a default, once calculated, is paid, the Commission "hold[s] deposits" made by defaulting winning bidders.[30] Even though the Commission's authority to auction new spectrum licenses has lapsed, those rules continue to apply to Hilliary's default in Auction 105.

Under the Commission's rules, a subsequent auction of the covered spectrum determines whether a defaulter like Hilliary will have to make a deficiency payment, and if so, the amount of that payment.[31] Hilliary is also responsible for an "additional payment" equal to at least 20% of its net winning bids,[32] which is why, consistent with the Commission's competitive bidding rules and agency practice, we levied an "interim default payment" of $161,193.00 when we denied Hilliary's request for waiver of the down payment deadline.[33] Hilliary offers no explanation for why the Commission must

[26] Hilliary Refund Request at 3.

[27] 47 CFR § 1.2104(g)(2).

[28] *Id.*

[29] *See Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Second Report and Order, 9 FCC Rcd 2348, 2382-83, para. 197 (1994) (*Competitive Bidding Second Report and Order*).

[30] *Id.* In the *Competitive Bidding Second Report and Order*, we stated that we would "hold deposits made by defaulting or disqualified auction winners to help ensure that the [default] penalty is paid." 9 FCC Rcd at 2383, para. 197. Because any deposited payment—upfront, down, partial, or final—is a "deposit," it has been the Commission's practice to hold any payments deposited by a winning bidder who has defaulted on its licenses until the winning bidder's final default payment can be calculated. *See, e.g., Application of the ERIE Radio Company*, LLC, 32 FCC Rcd 3890, 3897, para. 20 (WTB 2017) (holding the final payment of a winning bidder who defaulted on a construction permit for an FM radio station license pending a subsequent auction of the permit and calculation of the winning bidder's final default payment).

[31] 47 CFR § 1.2104(g)(2)(i).

[32] 47 CFR § 1.2104(g)(2)(ii); *see infra* note 21.

[33] *Order*, 37 FCC Rcd at 8234, para. 19; *see also* 47 CFR §§ 1.2104(g), 1.2106(e), 1.2107(b), 1.2109(b).

refund the interim default payment prior to determination of Hilliary's final default payment, only to have to collect it from Hilliary later.

Hilliary's binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction is also not dependent on the timing of any subsequent auction for the covered spectrum.  Less than five years has passed since the close of Auction 105.[34]  In a number of cases, the Commission has conducted subsequent auctions of spectrum licenses after longer periods have passed after a default.[35]  Furthermore, there may be no applicable subsequent winning bid in the first subsequent auction, which in turn can increase the length of time between when a default occurs and when a final default payment can be determined.[36]  The potential for a long period of time between a default and the determination of the final default payment amount only underscores the need for the Commission to retain relevant deposits to ensure the final default obligation is met.

We also disagree with Hilliary that the prospect of the Commission ever conducting a subsequent auction of the spectrum covered by the licenses on which it defaulted is "remote."  As Hilliary noted in its request, the lapse of the Commission's general auction authority was unprecedented.[37]  Congress has repeatedly extended prior expiration dates rather than permitting a lapse.[38]  Moreover, Congress has provided for the Commission to license spectrum using competitive bidding subsequent to the current lapse of its general authority.  Just last month, Congress authorized the Commission to conduct an auction for the purpose of granting licenses for specific spectrum in its inventory that had previously been auctioned, and defaulted upon, in Auction 97.[39]  Given that over 2,000 PALs remained unassigned after

---

[34] *Auction 105 Closing Public Notice*, 35 FCC Rcd at 9287, para. 1.

[35] *See e.g., Final Default Payment Obligation for Auction 98, The ERIE Radio Company, LLC*, Letter Order, 37 FCC Rcd 14010, 14010-11 (OEA 2022) (assessing a final default payment amount for a default on construction permits won in Auction 98 approximately 7 years after the default occurred); *Final Default Payment Amount for Auction 62 Construction Permit FM027-A (Boonville, CA), Wilbur Johnson,* Letter Order, 37 FCC Rcd 13094 (OEA 2022) (assessing the final default payment amount for defaulting on a winning bid for a construction permit in Auction 62 approximately 15 years after the default occurred); *TPS Utilicom, Inc.*, Letter Order, 22 FCC Rcd 16251 (WTB 2007) (assessing the final default payment amount for defaulting on a winning bid for licenses in Auction 35 approximately 6 years after the default occurred).

[36] *See e.g., Final Default Payment Amount for Two Auction 40 Licenses, Golden Arrow Paging, Inc.*, Letter Order, 37 FCC Rcd 14820 (OEA 2022) (assessing a final default payment amount for two licenses that were defaulted on in Auction 40, that were offered in Auction 87 but did not receive a winning bid, and that finally received a winning bid in Auction 95, nearly 12 years after the original default occurred).

[37] Hilliary Refund Request at 1.

[38] The Commission's general auction authority, as granted in 1993 by Congress, was originally set to expire on September 30, 1998, but has been extended by Congress several times, including a ten year extension from 2012 through September 30, 2022 and then four subsequent extensions that allowed the Commission to conduct auction activities through March 9, 2023.  Congressional Research Service, R47578, *The Federal Communications Commission's Spectrum Auction Authority: History and Options for Reinstatement* (2023).  Prior to March 9, 2023, Congress had not allowed for the Commission's general auction authority to expire.  Congressional actions to reinstate the FCC's auction authority have been ongoing since prior to the March 9, 2023 expiration.  *Id.*

[39] Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub.  L. No. 118-159, Div. E, Title LIV, § 5401-5405 (Spectrum and Secure Technology and Innovation Act), § 5403 (2024), https://www.congress.gov/bill/118th-congress/house-bill/5009.

Auction 105,[40] Congress similarly could provide authority to conduct a new auction of PALs specifically, even if the Commission's general auction authority is not restored.

Hilliary also claims that an auction of spectrum covered by defaulted PALs from Auction 105 is unnecessary because General Authorized Access (GAA) use is permitted in the license areas when PALs are not in use.[41]  Hilliary's claim that the Commission does not need to grant additional PALs for spectrum affected by its defaults expressly ignores the Commission's decision—made after twice soliciting and receiving comment from the public—to license spectrum in the 3.5 GHz band protected from GAA operations.[42]  When the Commission adopted rules to create the PALs in 2015, and when it later further refined their parameters in 2018, the Commission encouraged robust spectrum use by allowing for priority access to the spectrum.[43]  Hilliary's claim would effectively eliminate the priority spectrum access provided by PALs—that is, more predictable and less encumbered access to valuable mid-band spectrum—in the areas where Hilliary has defaulted.  Such a result would be contrary to the framework established by the Commission and would prevent interested entities from utilizing such priority access.

When the Commission updated the PAL parameters in 2018, it expressly determined that GAA use, by itself, does not "ensure that the spectrum is put to efficient use and promote[] economic opportunity and competition."[44]  Thus, if a winning bidder defaults on its PAL winning bids, opportunistic access to unused Priority Access channels by GAA—while an important aspect of the CBRS framework—does not fully meet the Commission's intended plan for the 3.5 GHz band.  Parties, including Hilliary, were willing to pay for the PALs in Auction 105, notwithstanding the alternative of utilizing the spectrum pursuant to GAA.  To deny the chance to other entities who are willing to pay for priority access would be contrary to the Commission's 3.5 GHz band framework.  We further note that Hilliary, in its Refund Request, does not provide a persuasive explanation of why PALs would not offer a benefit to other potential licensees, or why those benefits no longer affect use of the spectrum.[45]  Therefore, we reject Hilliary's assertion that a future auction of the spectrum associated with the PALs that were defaulted on in Auction 105 is "unnecessary."

We also reject Hilliary's argument that issuing a refund of its deposit would serve the public interest.  The public interest is served instead by Commission's default payment methodology.  That methodology protects the integrity of the auction process by both helping the Commission ultimately to receive the full value of the winning bid amount through the deficiency payment and deterring defaults

---

[40] FCC Public Reporting System, Auction 105 – 3.5 GHz, https://auctiondata.fcc.gov/public/projects/auction105 (last visited Jan. 16, 2025).

[41] Hilliary Refund Request at 2-3, citing 47 CFR § 96.35(a).

[42] *Amendment of the Commission's Rules with Regard to Commercial Operations in the 3550-3650 MHz Band*, GN Docket No. 12-354, Report and Order and Second Further Notice of Proposed Rulemaking, 30 FCC Rcd 3959 (2015) (*2015 Report and Order*); *Promoting Investment in the 3550-3700 MHz Band*, GN Docket No. 17-258, Report and Order, 33 FCC Rcd 10598 (*2018 Report and Order*).

[43] *2015 Report and Order*, 30 FCC Rcd at 3981-82, paras. 63-64, 67; *2018 Report and Order*, 33 FCC Rcd at 10601-02, para. 7.

[44] *2018 Report and Order*, 33 FCC Rcd at 10632-33, para. 62.

[45] Hilliary's statement that "re-auctioning of PALs … is wholly unnecessary" suggests that, going forward, there is a significant risk that little value may be placed on licensed 3.5 GHz spectrum, e.g., on PALs offered in a subsequent auction.  For reasons discussed above, we do not agree with Hilliary's statement.  If it were true, however, the Commission would have all the more reason to retain Hilliary's funds on deposit pending receiving applicable subsequent winning bids, given that they could be considerably lower than Hilliary's defaulted bids.

through the additional payment.  In adopting the rules governing bidder defaults, the Commission noted that it is "critically important to the success of our system of competitive bidding that potential bidders understand that there will be a substantial penalty assessed if they . . . default on a balance due."[46]  If the Commission cannot recover default payments, however, then default payments will have no deterrent effect. Thus, the Commission adopted rules that allow it to "hold deposits made by defaulting . . . auction winners to help ensure that the penalty is paid."[47]  Because the default payment rules are integral to the success of future spectrum auctions, the public interest will be served best by retaining Hilliary's deposited amounts pending determination of the final default payment.

Hilliary contends that the public interest will be best served by returning its payments so that it can invest in broadband access.[48]  This is unpersuasive because there is no guarantee that Hilliary will use the returned funds for this purpose or that such investment ultimately would further the public interest. By contrast, retaining funds on deposit to assure payment of to-be-determined final default obligations protects the public against the possibility that a defaulter will prove unable to satisfy the final default obligations when that amount can be finally determined and assessed.[49]  Given the amount of the defaulted bids at issue and the absence of other funds to satisfy Hilliary's ultimate final default obligation, prudence counsels that the Commission retain the amounts on deposit.

---

[46] *Competitive Bidding Second Report and Order*, 9 FCC Rcd at 2382-83, para. 197.

[47] *Id.*; *see* 47 CFR § 1.2106(e). Consistent with Commission precedent, following the application of an interim default payment, the remaining amount of monies on deposit with the Commission related to the matter have been held, including final payments. *See e.g., The Erie Radio Company, LLC*, Memorandum Opinion and Order, 32 FCC Rcd 3890, 3897, para. 20 (WTB/MB 2017) (retaining all payments on deposit, including a final payment amount, related to a default on construction permits in Auction 98 after an applicant failed to make its required down payment by the auction deadline).

[48] Hilliary Refund Letter at 3.

[49] *See TPS Utilicom, Inc*., Letter Order, 18 FCC Rcd 21332, 21336 (WTB 2003) (*TPS Utilicom Refund Denial)*.  In the case of *TPS Utilicom, Inc.*, the Commission similarly denied a request for a refund of the defaulter's total amount on deposit despite two years passing after Auction 35 without a subsequent auction of the same spectrum to determine the final default payment.  *TPS Utilicom Refund Denial*, 18 FCC Rcd at 21336-37.  Following an additional four years, the Commission conducted a subsequent auction for the defaulted licenses and was able to calculate the final default payment obligation.  *TPS Utilicom, Inc.*, Letter Order, 22 FCC Rcd 16251 (WTB 2007). The final default payment required the application of the defaulter's full amount remaining on deposit with the Commission, which ultimately did not entirely satisfy the final default payment as an outstanding balance remained. *Id.*

For the reasons stated above, we deny Hilliary's request.  This action is taken pursuant to authority delegated by sections 0.271 and 0.331 of the Commission's rules.[50]

Sincerely,


Mary Lovejoy
Chief, Auctions Division
Office of Economics and Analytics


Roger Noel
Chief, Mobility Division
Wireless Telecommunications Bureau


cc:    Robert A. Silverman
        Stephen T. Sharbaugh

---

[50] 47 CFR §§ 0.271, 0.331.